UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

_____

In re:

                                         Misc. Proc. No. 20-71002-SWD

RYAN DAVID CARLSON,

                                         U.S. Bankr. Court (D. Nev.)

       Debtor.                            Case No. BK-S-19-16289-ABL

_____/       Chapter 7

MEMORANDUM OF DECISION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
                    Chief United States Bankruptcy Judge

## I.  INTRODUCTION

CP Food and Beverage, Inc.'s Motion to Compel Discovery of Documents Pursuant to Order for Rule 2004 Examination and Subpoena (the "Motion," ECF No. 1) seeks the court's assistance in resolving a document production dispute in connection with the chapter 7 bankruptcy case of Ryan David Carlson (the "Debtor"), now pending in the District of Nevada.  The production occurred in connection with a Rule 2004[1] examination of Modern Bookkeeping, Inc. ("Modern") at the behest of the Debtor's judgment creditor, CP Food and Beverage, Inc. ("CP Food").  The dispute involves the assertion of the attorney-client privilege of Modern and its long-time clients, Harry Mohney and Déjà Vu Services, Inc. ("Déjà Vu") -- the Debtor's employer -- that initially arose in connection with CP Food's garnishment of the Debtor's wages from Déjà Vu.

The examination of Modern (and the document production) took place in the Western District of Michigan, so after Modern refused to produce a small number of documents (asserting

---

[1] The court will refer to any Federal Rule of Bankruptcy Procedure or Federal Rule of Civil Procedure simply as "Rule ___," relying on the numbering convention for each set of rules to identify the intended reference.

the attorney-client privilege) CP Food filed the Motion here, pursuant to Rules 45 and 9016.  No one suggests that the Motion should be heard in Nevada.  *See* Fed. R. Civ. P. 45(d)(2)(B)(i) and (f).

The court conducted a telephone hearing regarding the Motion on March 26, 2020, during which the parties narrowed the issues significantly.  For example, CP Food agreed that the "crime-fraud" exception to the privilege is no longer at issue.  The parties also agreed that the court could resolve the dispute by reviewing the documents, transcripts of two Rule 2004 examinations,[2] and other sworn statements submitted in connection with the matter,[3] without conducting a full-blown evidentiary hearing.  *See* Transcript of Hearing Held March 26, 2020 (ECF No. 15, the "Hearing Tr.") at p. 47:7-14; Fed. R. Civ. P. 43(c).  The parties seem to agree that Modern, as the proponent of the privilege, has the burden of proving that it applies.  *United States v. Dakota*, 188 F.3d 663, 667 (6th Cir. 1999).

At the conclusion of the hearing, the court directed Modern to submit the documents at issue under seal for *in camera* review, and authorized CP Food to supplement the record with a transcript of the Debtor's Rule 2004 examination.  Modern filed the documents as ordered, as well as a revised privilege log (ECF No. 18, the "Privilege Log") and CP Food filed an additional transcript.  The court has reviewed the sealed documents and other materials submitted in connection with the Motion, and for the following reasons will grant the Motion in part and deny it in part.

---

[2] *See* Transcript of the Rule 2004 Examination of Angela Swank on December 17, 2019 (ECF No. 1-11, the "Swank Tr."); Transcript of Rule 2004 Examination of Ryan David Carlson on November 13, 2019 (ECF No. 11, the "Debtor Tr.").

[3] *See* Affidavit of Angela Swank dated July 16, 2019 (ECF No. 5-8 (Exh. E), the "Swank Aff."); Supplemental Declaration of Angela Swank dated February 23, 2020 (ECF No. 5-12 (Exh. I), the "Supp. Swank Decl."); Declaration of Deanna L. Forbush dated February 24, 2020 (ECF No. 5-14 (Exh. K), the "Forbush Decl.").

## II. JURISDICTION

Despite the inter-district history of the proceeding, the court has jurisdiction to resolve the Motion.  The grant of bankruptcy jurisdiction vests the "district courts" with original and exclusive jurisdiction over "*all* cases under title 11."  28 U.S.C. § 1334 (emphasis added).  Which of the district courts is the proper venue for a proceeding is a matter for other law.  *See, e.g.*, 28 U.S.C. §§ 1409 and 1412.[4]  When it comes to the venue for enforcing a subpoena or protecting the target of a subpoena, Rule 45 specifies the proper venue as "the district court where compliance is required," rather than the issuing court (if the two are different).  Here, the Debtor commenced a case under title 11 in the District of Nevada, and CP Food's Nevada counsel, as an officer of that court, issued a subpoena compelling Modern to comply in the Western District of Michigan.  Our District Court has jurisdiction over the Debtor's case under 28 U.S.C. § 1334 and has referred the Motion to this court under 28 U.S.C. § 157(a).  The court has authority to resolve the Motion under 28 U.S.C. § 157(b)(2)(A) as involving the administration of the Debtor's estate, and likely § 157(b)(2)(I) as bearing on the Debtor's discharge.  No party has suggested otherwise.

## III. ANALYSIS

The parties apparently assume that Michigan law governing the attorney-client privilege applies to their dispute, and the court sees no reason to disagree given that Modern and several of the attorneys involved in the communications are located here (or addressed clients with Michigan contacts).  In addition, the parties rely largely on Michigan authorities in this civil proceeding.  *See* Fed. R. Evid. 501.  Moreover, no one has suggested any material differences in the scope of the privilege from state to state (or from federal common law) at least as applicable to the present controversy, and the court is aware of none.  Finally, Michigan courts sometimes look to federal

---

[4] *See generally Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939) (discussing difference between subject matter jurisdiction and venue).

precedent in determining the scope of the privilege. *Estate of Nash by Nash v. City of Grand Haven*, 909 N.W.2d 862, 866 (Mich. App. 2017).

The attorney-client privilege, which our Supreme Court has called "the oldest of the privileges for confidential communications known to the common law," *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981), is easy to articulate, though sometimes difficult to apply. An influential Sixth Circuit opinion, cited by Modern, frames the privilege as follows by recognizing that it applies:

> (1) where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir.), *cert. denied*, 525 U.S. 820 (1998). Courts construe the privilege narrowly[5] but guard it jealously[6] because it has a dual aspect:  on the one hand, it stands in the way of a court's truth-seeking function;[7] on the other, it encourages people to conform their conduct to the law by letting them consult counsel without fear of embarrassment from later disclosure of the communications, back and forth. *Upjohn*, 449 U.S. at 389 (the privilege "promote[s] broader public interests in the observance of law and administration of justice").

Not every communication is privileged, of course, only communications seeking or giving legal advice, not business advice. For example, discussion of arrangements regarding fees and retainers cannot be construed as communications involving legal advice, although certainly related to establishing the relationship. *Blonde v. Long*, No. 304653, 2014 WL 316478, at *11 (Mich. Ct.

---

[5] *Reed Dairy Farm v. Consumers Power Co.*, 576 N.W.2d 709, 711–12 (Mich. App. 1998) (privilege is narrow).

[6] *Chore-Time Equip., Inc. v. Big Dutchman, Inc.*, 255 F. Supp. 1020, 1021 (W.D. Mich. 1966) ("the attorney-client privilege is so sacred and so compellingly important that the courts must, within their limits, guard it jealously").

[7] *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997); *In re Grand Jury Proceedings*, 78 F.3d 251, 254 (6th Cir. 1996); *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 451 (6th Cir. 1983).

App. Jan. 28, 2014); *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 383 (6th Cir. 1997) (District Court properly regarded discussion between attorney and client about fees at the start of the action as non-privileged "financial discussion that did not involve the seeking or provision of legal advice").

It is well-settled that a client may waive the privilege by disclosing communications to third parties in certain circumstances, yet those circumstances generally do not include sharing the communications with the client's employees or other agents, or with joint clients. As the Michigan Court of Appeals explained:

> Where an attorney's client is an organization, the privilege extends to those communications between attorneys and all agents or employees of the organization authorized to speak on its behalf in relation to the subject matter of the communication.

*Reed Dairy Farm*, 576 N.W.2d at 711–12; *Wrench LLC v. Taco Bell Corp.*, 212 F.R.D. 514, 517 (W.D. Mich. 2002); *see generally* Restatement (Third) of the Law Governing Lawyers §§ 75 and 76 (2000) (discussing co-client and common interest privilege).

The historical facts bearing on this dispute are not complicated or seriously in dispute.[8] Modern served as the bookkeeper for Déjà Vu and other entities comprising Harry Mohney's adult entertainment enterprises. Although technically a distinct entity, Modern functioned largely as the payroll and accounting department for Déjà Vu.

The Debtor's relationship with Déjà Vu started as a contract consulting arrangement, but that changed in July 2017 when he became Déjà Vu's employee. He has been the company's "W-2" employee since that time. At the time of the communications at issue, he was employed as Déjà Vu's "Director of Operations" according to Ms. Swank. *See* Supp. Swank Decl. at ¶ 9.

---

[8] Much of the factual recitation comes from the testimony of Modern's president, Ms. Swank, whom CP Food's counsel described as "completely forthright" and "very cooperative." Hearing Tr. at 5:14-18. Indeed, the transcript of her Rule 2004 examination paints a picture of a straight-shooter.

The Debtor's testimony at his Rule 2004 examination tended to downplay his role in affecting Modern's response to CP Food's garnishment, Debtor Tr. at 56:9-57:24, but he evidently had a substantial role in his employer's business generally. Ms. Swank testified in her Rule 2004 Examination that the Debtor "oversees the Lansing and Las Vegas Deja Vu Services offices," and has "staff at the Las Vegas office that help him with his paperwork, and stuff like that." Swank Tr. at 20:20-23. The Debtor's communications with Ms. Swank were not limited to the garnishment but "about all different subjects almost every day." Swank Tr. at 80:19-20. She calculated that during the relevant period she received "on average, 23.72 emails per day from Ryan Carlson on business-related matters, the vast majority of which would not relate in any way to any monies owed or paid to Ryan Carlson (or any entity on his behalf)." Swank Aff. at ¶ 12. Ms. Swank described the Debtor as "management people." Swank Tr. at 81:8-23; *see also* Supp. Swank Decl. at ¶ 9.

The court acknowledges that in response to a question about whether he gave Modern instructions about the garnishment, the Debtor said, "I don't have any authority to instruct them for anything there." Debtor Tr. at 57:15-18. This statement, as CP Food argued, tends to support the company's view that the Debtor's involvement in the various emails at issue was not necessary, and reveals his frustration about his inability to "find some way to get around the garnishment for months," in Ms. Swank's words. Swank Tr. at 109:19-110:17. Nevertheless, Ms. Swank's other testimony, on balance, shows that the Debtor played a substantial role in his employer's business, including matters involving Modern as Déjà Vu's agent generally and regarding the response of both to CP Food's garnishment. It also demonstrates her reasonable belief that when she was communicating with the Debtor she was communicating with her client, whose opinion and information was relevant to her work. Supp. Swank Decl. at ¶ 14.

While the record creates the distinct impression that the Debtor endeavored to out-maneuver CP Food as the garnishing creditor, it also tends to show that he tried to do so by floating "trial balloons" with Modern and their counsel, especially Mr. Hoffer, to see what steps would pass legal muster.  He considered some arrangements involving automatic teller machines ("ATMs"), a company-funded condominium, changing residency -- none of which won approval. *See* Swank Tr. at 109:19-110:17.  His motivation may be less than honorable, but the behavior is precisely what the privilege is designed to encourage.  *Upjohn*, 449 U.S. at 389 (purpose of the privilege is to encourage clients to seek legal advice in order to "promote broader public interests in the observance of law and administration of justice.").  The privilege does not only protect the pure of heart.

Without access to the redacted or withheld materials, CP Food's tongue is tied to some extent, at least insofar as crafting arguments about the nature of the communications are concerned.  Without access to the contents, CP Food's main argument is premised on supposed waivers of the privilege, based mostly on inferences drawn from the information revealed in Modern's privilege logs -- primarily information about the entities involved in the allegedly privileged communications.

CP Food argues that (i) the lawyers involved cannot represent more than a single client; and (ii) sharing the communications with the Debtor waived any privilege because his interest regarding the garnishment diverged from that of his employer and Modern.  On the first point, CP Food argues that "a lawyer can only serve one master," citing *El Camino Res., Ltd. v. Huntington Nat. Bank*, 623 F. Supp. 2d 863, 877 (W.D. Mich. 2007).  Hearing Tr. at 7:13-14.  Although the court does not quarrel with the *El Camino* court's decision to disqualify the law firm in that case from representing parties on both sides of the pending litigation, the representation at issue in the

current dispute is decidedly more transactional or operational, where it is common and sometimes desirable for a lawyer to represent several constituents of a larger enterprise (including agents). *See* Restatement (Third) of the Law Governing Lawyers § 75 (2000) ("The rule recognizes that it may be desirable to have multiple clients represented by the same lawyer."). Ms. Swank's testimony establishes that this was the arrangement under which Modern and Déjà Vu operated, and CP Food offers only argument in opposition.

And even assuming, *arguendo*, the attorney-client relationships in this case were tainted by a conflict (given the potential divergence of interests related to the garnishment), the court would not expect the *clients* to perceive the conflict under the circumstances. In addition, the possible conflict would not, in the court's view, make their reliance on the confidentiality of the relationship unreasonable. In other words, the clients might reasonably regard the relationship as an attorney-client relationship entitling them to speak in confidence, even if a court, in hindsight, believes the lawyer labored under a conflict of interest or that joint representation was imprudent. *Cf. Chore-Time Equip., Inc.*, 255 F. Supp. at 1023 n.9 ("The theory of the privilege . . . clearly requires that the client's *bona fide* belief in the status of his adviser as an admitted attorney should entitle him to the privilege") (citation omitted).

With these principles in mind, the court turns to the documents Modern filed under seal for *in camera* review.

A.      **DOCUMENTS PRODUCED IN REDACTED FORM**

1.      Bates No. 001394 (Email Chain -Jan. 21, 2019)

The document identified as Bates No. 001394 is a string of emails involving the Debtor and Ms. Swank, the bottom portion of which is redacted. The redacted portion sets forth Ms. Swank's opinion about the Debtor's proposal to change his employer's arrangements involving

ATMs.  Ms. Swank's statements, though perhaps affected by advice she received from attorney Robert Biederman, do not reveal any communication to or from him, only her opinion about the Debtor's proposal.  The only plausible basis for the redaction is the last line on the document that reads "From: Robert Biederman <rlbiedermanatty@aol.com>."  Regardless, there is nothing in the redacted portion revealing Mr. Biederman's advice.  This document simply embodies a communication between non-lawyers without revealing the substance of the lawyer's advice and is, therefore, not protected by the privilege.

    2.      Bates Nos. 001412, 001431 (Email Chains -July 9 and 23, 2018)

The court will treat these next two documents together because the analysis for both is identical.  The redacted portions relay from Ms. Swank to the Debtor the advice the former received from Modern's counsel, Mr. Hoffer.  As set forth above, the Debtor's role in the management of his employer justified Ms. Swank in believing that she could share Mr. Hoffer's advice in confidence, without waiving the privilege, given the common interest and representation established by the documents submitted in connection with the Motion.  Having reviewed the record and the redacted emails *in camera*, the court finds no basis for treating the communication as waived.  Instead, it appears that the privilege is operating as intended -- individuals working for a joint enterprise are seeking legal advice in an effort to comply with legal requirements affecting their common interest.  Modern need not disclose these documents, as they are, and remain, protected by the attorney-client privilege.

    3.      Bates Nos. 001687-00168 (Email Chain August 22, 2019

The August 22, 2019 email chain presents a different issue, not of waiver but of whether the communication falls within the privilege in the first instance.  The document reflects discussions regarding the funding of the Fox Rothschild LLP retainer for representing the Debtor

in his bankruptcy proceeding, discussed to some extent during the Debtor's and Ms. Swank's Rule 2004 examinations.

First, and most generally, the privilege should be narrowly construed -- not every utterance of counsel is within its protection.  Second, and more specifically, it is well-settled, as noted above, that communications regarding fees and retainers are generally not communications that the attorney-client privilege protects against disclosure.  *Blonde v. Long*, No. 304653, 2014 WL 316478, at *11 (Mich. Ct. App. January 28, 2014); *DeLorean*, 123 F.3d at 383.  To the extent that the redacted material reveals the identity of a client (whether the Debtor or Mr. Mohney), that fact is generally not protected by the privilege, either.  "The federal forum is unanimously in accord with the general rule that the identity of a client is, with limited exceptions, not within the protective ambit of the attorney-client privilege."  *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 451 (6th Cir. 1983).

Despite the *in camera* review, Modern has not met its burden of establishing that Bates Nos. 001687-00168 fall within the attorney-client privilege.  Modern must produce them in unredacted form.

B.     **DOCUMENTS PREVIOUSLY WITHHELD**

Having reviewed the documents not previously produced (identified on the most recent Privilege Log in rows 9-14), the court finds the documents falling squarely within the privilege, and properly withheld.  As noted several times in this opinion, the relationships of the parties, as agents of Déjà Vu, and lawyers for either Déjà Vu, Modern, Mr. Mohney, the Debtor, or some combination, do not justify a finding of waiver under the circumstances.[9]  The conversations reveal

---

[9] Although Robert Biederman did not generally serve as Modern's counsel, Swank Tr. at 23:5-7, Modern was certainly justified in believing that its communications with Déjà Vu's counsel in connection with their respective compliance with the garnishment procedure was a confidential communication for the purpose of securing legal advice, given the close relationships described in the record.

the efforts of the communicants to obtain and provide legal advice about Modern's and Déjà Vu's response to CP Food's garnishment of the Debtor's wages. The privilege is operating as intended with respect to these documents, *Upjohn*, 449 U.S. at 389, and the court will not compel their production.

## IV.  CONCLUSION AND ORDER

The *in camera* review persuades the court that Modern and its counsel undertook a principled approach to the privilege. The court certainly does not have the sense, after conducting the *in camera* review, that the proponents of the privilege were unfairly using it to hide the proverbial "smoking gun" or other damaging evidence. Much of the subject matter of the communications has already been revealed in discovery, at least as shared with this court in connection with the Motion, because the privilege "does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn*, 449 U.S. at 395-96. Modern's counsel observed this distinction, for example, by permitting CP Food to inquire into the Debtor's efforts to stymie collection and the circumstances relating to the Fox Rothschild retainer. *See* Swank Tr. at 59:24-60:20; *id*. at 109:19-110:17; Debtor Tr. at 89:21-94:18. The court is satisfied that, for the most part, the attorney-client privilege is working as it should, and not unfairly so. Accordingly, it will grant the Motion in part, and deny it in part.

Nevertheless, because the court acknowledges room for differences of opinion especially in matters involving the attorney-client privilege and because a privilege is fragile -- irretrievably lost upon disclosure of the communication -- the court will stay today's order for 14 days.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.      The Motion is GRANTED in part and DENIED in part;

2.      Modern shall promptly produce documents bearing Bates No. 001394 and 001687-00168 in full, without redaction, and may continue to withhold the other documents at issue in the Motion under a claim of privilege; and

3.      The obligation to produce documents as set forth herein is stayed for 14 days from entry of this Memorandum of Decision and Order.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Matthew Hoffer, Esq., and Jonathan E. Lauderbach, Esq., and send a courtesy copy to the Clerk for the United States Bankruptcy Court, District of Nevada.

END OF ORDER

**IT IS SO ORDERED.**

**Dated April 21, 2020**



Scott W. Dales
United States Bankruptcy Judge